**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **SHEVONNE MOORE,** | CASE NO. 3:24 CV 1010 |
| Plaintiff, | |
| v. | JUDGE JAMES R. KNEPP II |
| **ALLSTATE VEHICLE & PROPERTY INSURANCE CO.,** | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

### INTRODUCTION

Currently pending before the Court is Defendant Allstate Vehicle and Property Insurance Company's Motion for Summary Judgment (Doc. 27); Plaintiff opposes (Doc. 35) and Allstate replies (Doc. 36). Also pending is Intervening Defendant Lakeview Loan Servicing, LLC's Motion for Summary Judgment (Doc. 26); Allstate opposes (Doc. 30), and Lakeview replies (Doc. 32). Jurisdiction is proper under 28 U.S.C. § 1332. For the reason set forth below the Court denies both motions.

### BACKGROUND

Factual Background

This case involves a dispute regarding insurance coverage for a July 2023 fire at a Plaintiff's residential property at 75 Birckhead Place in Toledo, Ohio. *See* Doc. 1.

*Prior Insurance Coverage / Fire*

Prior to coverage under the currently-at-issue Allstate Policy, Plaintiff had an insurance plan covering the property under the Ohio FAIR Plan. (Plaintiff Examination Under Oath

("EUO"), at 22).[1] Prior to June 2022, Plaintiff lived at the property for sixteen or seventeen years. *Id.* at 25. In June 2022, Plaintiff's property was damaged by smoke from a fire. *Id.* at 23, 67. The Ohio FAIR Plan provided coverage for the damage, including amounts for personal property, the building structure, and temporary housing. *See id.* at 21-23, 38-40, 43-45.

After the June 2022 fire, Plaintiff did not live in the property, nor was her personal property there, because the property was undergoing repairs. *See id.* at 20-25; *see also id.* at 41-42 (describing contractor and anticipated timeline for completion). Plaintiff further testified there was no water or electricity service at the property in 2023 (before or after the subsequent, July 2023, fire presently at issue). *Id.* at 49, 55-57, 92.[2] The water was turned off after the first fire in June 2022. *Id.* at 56. At the time of her deposition in October 2023, Ohio FAIR Plan had stopped paying for Plaintiff's temporary housing, and she was paying out of pocket *Id.* at 44-46.

Before the June 2022 fire, Ohio FAIR Plan instructed Plaintiff she needed to fix her back balcony or it would not continue to insure her. *Id.* at 73; *see also id.* at 81-82 (testifying regarding Ohio FAIR Plan ceasing insurance). She did not fix it and therefore sought a homeowner's insurance policy from a different company. *Id.*

*Application for Allstate Policy*

Plaintiff applied for an Allstate homeowner's insurance policy over the phone through agent J. Mark Atkins. *Id.* at 76. Atkins asked Plaintiff questions and filled out the application. *See id.*; Atkins Depo., at 25; *see also* Atkins Depo., at 15-16 (stating that Atkins fills out the application based on information provided by the customer).[3]

---

1. The transcript of Plaintiff's EUO is located at ECF Doc. 35-1.
2. Plaintiff also testified that she did not have natural gas service at the house. (Plaintiff EUO, at 50).
3. The transcript of Atkins's deposition is located at Doc. 35-3. References to page numbers are to the internal deposition page number, not the ECF page number.

Atkins testified he did not ask Plaintiff if her home was under construction:

Q: Okay. Do you remember talking to Shevonne Moore about the dwelling being under construction?

A: No.

Q: Okay. Do you know if you asked her if it was under construction?

A: I did not because the home was completed. There was no indication that it was under construction. She never mentioned anything.

(Atkins Depo., at 87). Plaintiff also testified she affirmatively told Atkins she was making repairs:

Q: Is there anything else that you remember that he did ask you?

A: Was - - he asked he how long I'd been there, was I making any repairs, and I told him.

Q: You told him what?

A: That I had in - - to make repairs, and he said you can make all the repairs you need to make to your home. And that was it.

(Plaintiff EUO, at 78).

Plaintiff testified she did not recall if Atkins asked her if she was living at the property or if she had prior losses. (Plaintiff EUO, at 76). Plaintiff further testified she did not tell him she had a prior fire because "[h]e didn't ask." *Id.* at 77. She also responded affirmatively to the question: "Did you tell him that you lived at 75 Birckhead Place?" but stated she did not recall whether she told him she lived elsewhere when applying for the policy. *Id.* at 76-77. Atkins also testified in various ways regarding whether he had asked Plaintiff if she lived at the property:

Q: Okay. And then it says, will the residence be occupied within the next 30 days and the answer is yes. Do you remember asking that question?

A: I asked her if she lived there and she said yes.

Q: Okay.

3

A:      That was part of her - - when we go through - - it's part of the process. We want to make sure it's a primary address, not a secondary or a rental.

Q:      Okay. And it doesn't specifically ask for a primary address though, does it?

A:      It does on one of the pages somewhere. Because if it was not a primary it would - - if it were a secondary, it would be a different policy. If it were a rental, it would be a different policy.

Q:      Okay. And did you - - do you remember, like explaining to her what residence - - or primary residence is or what that definition is?

A:      I do not remember.

Q:      You just asked if she lived there?

A:      Correct. If it's her primary address.

* * *

Q:      And we are still on page 4 of Exhibit A. Will the residence be occupied within the next 30 days. That's a question written there, correct, Mr. Atkins?

A:      Yes.

Q:      And was that answer automatically uploaded or did Ms. Moore provide that response?

A:      Yeah. She - - that's based on her information. She gave me no indication that she was not living there.

Q:      Okay.

A:      Because she - - the time - - amount of time she had been there.

(Atkins Depo., at 71-74).

Atkins testified that as part of the application process, he runs a "comprehensive loss run evaluation," referred to as a "CLUE" report. *See id.* at 12-13. Atkins believed this to be "an industry-wide system." *Id.* at 47. Atkins testified he will "follow up with questions" on such

4

reports if there are, e.g., losses reported. *Id.* at 24. Atkins ran this report as to Plaintiff and "[n]o losses were returned." *Id.* at 47. Atkins had the ability to override or adjust the losses reported based on information provided by the applicant. *Id.* at 49 ("You can go in and add losses, if they provide them, you can go in and remove a loss if the customer disputes it."). Atkins confirmed that the absence of any loss reported on the application was not a result of him removing any losses. *Id.* at 50.

Atkins further testified the five-year loss history section of the application "was based on the information that came back from the loss reports and information gathered from [Plaintiff]." *Id.* at 74-75 (explaining loss information application is generated from the loss report unless Atkins "override[s] it based on information provided from the customer"). He did not recall whether he asked Plaintiff specifically about the five year loss history. *Id.*

The application itself states Plaintiff has lived at the address for five years,[4] and that she purchased the property in October 2010. (Doc. 9-2, at 1, 4). It states Plaintiff lives in the building as an "owner" and that it is her primary residence. *Id.* at 4. In response to the question "Will the residence be occupied within the next 30 days?" the application says "YES." *Id.*

Under a section entitled "5 YEAR LOSS HISTORY (including losses at present and prior residences)," it says "NONE." *Id.* It further says "NO" after "Dwelling in Course of Construction." *Id.* The application contains a line for the applicant's signature and date, under a statement that reads, "I have read this entire application, including the binder provision, before

---

4 . Akins testified "I believe it's five or more. The system asks, you know, one through five or five or more" but then states five on the application. (Atkins Depo., at 31-34).

signing." *Id.* at 6. The signature line is blank and it is not signed by Plaintiff, *id.*; the same is true for a line for "Applicant's Initials" in the middle of the application, *id.*[5]

Atkins was unaware if Plaintiff ever signed the application but testified she "was emailed a copy to sign." (Atkins Depo., at 41); *see also id.* at 82. Atkins always submits the application to Allstate prior to any signature. *Id.* at 42 ("The signature is after the application."). He testified that at the same time, customers are emailed their copy of the application and there is a way for the customer to affix a digital signature. *Id.* at 42-44. Upon further questioning, he explained:

Q: Okay. Do you have any application that has been signed by Shevonne Moore?

A: I do not.

Q: And did you say that it's common or typical for Allstate to proceed with an insurance policy, even with an unsigned application?

A: Well, they do, yes. They send it to them for signing. I don't know, you know, what their stance is on if they don't sign it or not.

Q: Okay. So there's no, I guess, guideline or rule for you to, you know, verify that the application has been signed before submitting it to Allstate or anything like that?

A: No. We submit it to - - we submit it to the customer to sign, along with a review.

Q: And then, does that happen before or after you send the application to Allstate?

A: It happens at the time we send it to Allstate. When I hit the button to submit the application, it sends the customer a copy to sign and to review.

*Id.* at 43-44. Atkins also testified that he tells clients to review the application and policy to make sure everything is correct. *Id.* at 98.

---

5. Barbara Bachmeier, an Allstate investigator, testified that the reason for the applicant's initials on this section of the application is "[t]o acknowledge the answers." *Id.* at 58.

The application submitted on Plaintiff's behalf also states that that a "Claim Free" discount has been applied. (Doc. 9-2, at 2). Again, Atkins explained such discount is "determined by the system" and automatically applied when the loss report is run and returns no losses. (Atkins Depo., at 46-47, 53-54).

*Allstate Policy*

Allstate issued policy number 826 679 326 to Plaintiff for the property with an effective date of October 28, 2022. *See* Doc. 9-1, at 8.[6] Atkins testified the application was both submitted and processed on October 21, 2022. (Atkins Depo., at 81). The policy included the Ohio Amendatory Endorsement AVP103-3, which provides, *inter alia*:

**Misrepresentation, Fraud Or Concealment**
It is understood and agreed that the statements made by any named insured, or any applicant, in the applicant for insurance, during the application process, during the renewal process, or on the Policy Declarations, are warranties and are incorporated into, and shall form part of this policy.

This entire policy is void from its inception if any warranty made by any named insured, or any applicant, is found to be false.

**We** may not provide coverage for any insured who has made fraudulent statements or engaged in fraudulent conduct in connection with any accident or loss for which coverage is sought under this policy.

(Doc. 9-1, at 34).

Plaintiff testified that at some point, she received a copy of her Allstate Policy and read it. (Plaintiff EUO, at 79). She responded "no" to the question of "was there anything that when you read it you said oh, that's not correct, I need to correct that for Allstate?" *Id.*

---

6. Atkins testified he submitted the application on October 21, 2022, and it was processed on the same date. (Atkins Depo., at 81). Plaintiff received a discount for the insurance not starting until seven days after the application. *Id.* at 40-41.

*2023 Fire, Investigation, and Recission*

Plaintiff's property was again damaged by a fire on July 15, 2023. *See* Doc. 1; (Plaintiff EUO, at 83-89). The fire was so severe the fire department knocked the entire structure down. *See* EUO at 87-88 ("I think they said it was hotspots or something, and that's why they had to knock it down."). Plaintiff had no personal belongings in the home at the time of this fire. *Id.* at 89.

Plaintiff submitted a claim to Allstate. Barbara Bachmeier, a special investigator with Allstate, took over from a prior investigator and investigated Plaintiff's claim on behalf of Allstate. (Bachmeier Depo., at 6, 8-11).[7] An adjuster referred Plaintiff's claim for investigation because "there were questions with the application" and they wanted an investigator to "verify if it was, in fact, occupied or if it was empty," as well as if there were previous fires. *Id.* at 12. As part of that investigation, on October 10, 2023, Plaintiff provided an Examination Under Oath to Allstate. *See* Doc. 35-1. Bachmeier was present at that examination. *See id.* at 5.

Contrary to Atkins's and Plaintiff's testimony, Bachmeier testified she thought Plaintiff filled out the application at the agent's office. *Id.* at 16. She testified the prior investigator had interviewed Atkins and the notes indicated Atkins said Plaintiff told him that she was renovating, but not that there was a prior fire. *Id.* at 17; *see also id.* at 22. Bachmeier also testified she "believe[d] . . . the agent was not aware that it was under construction. He was told that it was being renovated and that she would be moving back in within 30 days. So that was the agent's understanding, to my - - but that's something you would have to ask the agent and [prior investigator]." *Id.* at 79. She testified that she "believe[d]" the application was signed, but if it

_____

7. The transcript of Bachmeier's deposition is located at Doc. 35-5. References to page numbers are to the internal deposition page number, not the ECF page number.

was not, it would not have impacted her investigation. *Id.* at 17. As to Plaintiff's application itself:

> Q: Okay. Do you know if the - - in this specific case for Shevonne Moore, do you know if she, you know, hand wrote the application? Do you know if she filled it out and inputted the information on her computer? Do you know if the agent did that for her? What do you know about Shevonne Moore's application?
>
> A: I do not know that.
>
> Q: Okay. So when you investigate the actual application, what is it that you investigate?
>
> A: The answers to the questions that are on the application.
>
> Q: Okay, do you investigate who answered those questions?
>
> A: Well, if it's signed, they're attesting to the fact that the answers on the application are true.
>
> Q: Okay. What if it's not signed?
>
> A: It should be the applicant that's filing out the application. Or they - - either that or they're sitting there with the agent filling out the application.
>
> Q: Okay. Do you know if agents typically fill out the application on behalf of the applicant?
>
> A: You would have to ask an agent.
>
> Q: But you didn't ask the agent in this case that you're supposed to investigate?
>
> A: That would have been - - [the prior investigator] would have done that.
>
> Q: And then, in past cases that you investigated, do you ask the agent if they manually filled out the application or if the applicant did it?
>
> A: Generally, in the file we can tell by looking at it if it's got an electronic signature or if it's signed. And if it's not signed, then, I would ask the agent, did they come into the office and take out this application, did they do it over the phone or did they do it on the internet. So that would be a question I would ask the agent.

9

*Id.* at 27-29. Bachmeier testified either the agent or the client inputs the information into the application. *Id.* at 45. She stated she was not aware of any outside or third-party sources that input application information. *Id.* Bachmeier testified her investigation revealed Plaintiff was not "claim free," but she did not know how that particular discount ended up on the application. *Id.* at 49-51. In particular, she testified:

> Q: Okay. Have you ever heard of the CLUE loss report?
>
> A: I have heard of it, yes.
>
> Q: Okay. What do you know about that?
>
> A: I've never used it. I have no idea how to access it. That's - - all I know is that it's there.
>
> Q: So if that claim-free discount was inputted or generated by the agent or a second or third-party resource like a CLUE loss report, would that change your findings to void the policy?
>
> A: I - - I can't answer that. I don't know what - - what that would have done because that didn't happen.
>
> Q: But you don't know who put claim-free there?
>
> A: I do not.

*Id.* at 51. Bachmeier testified she had access to a different database to identify prior losses, called "ISO Claims"; she did not believe agents had access to this. *Id.* at 60-62.

Bachmeier explained, "[g]enerally, it would be the insured" who provides the answers to the application questions because "it wouldn't be questions that the agent would know the answers to without asking the insured." *Id.* at 58. She did not know who put "YES" on the application next to the question of whether the residence would be occupied within the next 30 days. *Id.* at 59. She testified that, hypothetically, if an individual intended to move into the

10

insured residence within 30 days but did not, "it wouldn't be a strict void[ing]," of the insurance policy but she "would look into it further." *Id.* at 82.

Bachmeier described her understanding that there was some difference between renovation and construction, but she did not know if the policy had separate definitions or if anyone explained such a difference to Plaintiff. *Id.* at 81. She also stated, "most likely not" in response to the question of whether "[h]ypothetically, if [Plaintiff] explained the construction or renovation in her examination under oath, would you have still included this in your rescission letter?" *Id.* at 93. Bachmeier testified further:

> Q: All right. So if she addresses these prior losses in her examination under oath, why did you rescind the policy?
>
> A: She addressed them. She didn't - - because on the application . . . it conflicted with what she said in the examination under oath. So you have two different stories.
>
> Q: Yeah, but didn't you testify that you weren't sure who put that information in the application?
>
> A: I did, but that would have been clarified in the examination under oath.
>
> Q: Right. And she did clarify that, correct?
>
> A: I believe she clarified that she put that information in there. I am not sure. I can't testify to that.
>
> Q: Okay. Again, hypothetically speaking, if she did not - - if she testified in her examination under oath that she did not fill out that application and put those answers in that application, sign that application and then during her examination under oath she explains the prior losses, would that have affected your decision to rescind the policy?
>
> A: Hypothetically, it may have.

*Id.* at 94-95.

When asked about to the lack of Plaintiff's signature on the application, Bachmeier testified:

> Q: Okay. And you don't remember this unsigned application being an issue with, I guess, your decision to void or underwriting's decision to void, is that fair to say?
>
> A: Yes. That's fair.

*Id.* at 89. Bachmeier ultimately recommended the policy be declared void based on representations in the application. *Id.* at 18.

Following its investigation, Allstate sent Plaintiff a recission letter on November 29, 2023, stating the policy was void *ab initio*, citing purported misrepresentations regarding residency at the property, construction at the property, and prior losses. *See* Doc. 9-3 (recission letter authored by Bachmeier). It states, *inter alia*,

> We have declared your policy to be void because our investigation has revealed the following provision(s) in your application for insurance have been violated:
>
> You stated that you were residing or would be residing at the property location within 30 days of inception of the Allstate policy. In addition you indicated the property was not under construction.
>
> You advised on your application that you had no prior losses within the last five years, however, our investigation revealed that this is not true.
>
> A Claim Investigation revealed that the property was under construction from a prior fire and you were receiving living expense payments from your prior carrier to reside elsewhere while renovations were being made.

*Id.* at 1. Bachmeier testified these determinations were made based on the information in the application and Plaintiff's EUO. (Bachmeier Depo., at 91-92). And she testified that "[a]fter the examination under oath, during which time it was determined who filled out the application, yes, I went forward with the void." *Id.* at 105.

Mortgage

Plaintiff had a mortgage on the home through Lakeview Loan Care Servicing. (Plaintiff EUO, at 25). The Declarations page of the at-issue Allstate policy lists Lakeview Loan Servicing, LLC as Mortgagee. (Doc. 9-1, at 6). The policy also contained a mortgage clause:

> **18**. **Mortgagee**
> A covered loss will be payable to the mortgagee(s) named on the Policy Declarations, to the extent of their interest and in the order of precedence. All provisions of **Section I** of this policy apply to these mortgagees.
>
> **We** will:
> a)      protect the mortgagees interest in a covered **building structure** in the event of an increase in hazard, intentional or criminal acts of, or directed by, an **insured person**, failure by an **insured person** to take all reasonable steps to save and preserve property after a loss, a change in ownership, or foreclosure if the mortgagee has no knowledge of these conditions; and
> b)      give the mortgagee at least 10 days notice if **we** cancel this policy.
>
> The mortgagee will:
> a)      furnish proof of loss within 60 days after notice of the loss if an **insured person** fails to do so;
> b)      pay upon demand any premium due if an **insured person** fails to do so;
> c)      notify **us** in writing of any change of ownership or occupancy or any increase in hazard of which the mortgagee has knowledge;
> d)      give **us** the mortgagee's right of recovery against any party liable for loss; and
> e)      after a loss, and at **our** option, permit **us** to satisfy the mortgage requirements and receive full transfer of the mortgage.

(Dc. 9-1, at 24).

Procedural Background

The present lawsuit followed Allstate's recission of the policy. Plaintiff originally filed suit in the Lucas County Court of Common Pleas on May 10, 2024, alleging breach of contract and bad faith. (Doc. 1-3, at 4-8). Allstate removed the case to this Court. *See* Doc. 1. Allstate then filed an Amended Answer and Counterclaim for Declaratory Judgment seeking the policy to

13

be declared void *ab initio*. (Doc. 9). Lakeview, the mortgagee on the property, intervened as a

Defendant and answered Plaintiff's Complaint. *See* Docs. 16, 16-1. It also asserts the following

affirmative defenses:

> 24. Moore failed to join all necessary parties.
>
> 25. Lakeview has an interest in the insurance policy at issue as mortgagee.
>
> 26. Pursuant to the Mortgagee Clause of the policy at issue in this matter, Lakeview is entitled to be paid for any covered loss.
>
> 27. If Moore prevails on her claims against Allstate and payment under the said policy is issued, Lakeview is entitled to have its mortgage paid in full pursuant to the Mortgagee Clause in the policy.
>
> 28. MERS [sic] reserves the right to assert any and all defenses that may develop during the course of this matter, via discovery or otherwise.

(Doc. 16-1, at 3-4).

Allstate now moves for summary judgment in its favor "as to all claims asserted by

Plaintiff and Intervening Defendant Lakeview Loan Servicing, LLC." (Doc. 27, at 2). Lakeview

additionally filed a summary judgment motion requesting "that if this Court determines Plaintiff

is owed any amount of the insurance proceeds at issue from Allstate, then any judgment should

reflect Lakeview's entitlement to the proceeds in the amount of the full unpaid principal balance

of the Loan due and owing when the judgment is issued." (Doc. 26, at 4).[8]

### STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When

considering a motion for summary judgment, the Court must draw all inferences from the record

in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*

---

8. Lakeview noted that the unpaid principal balance was $36,309.55 at the time of filing, but the amount would change over time. (Doc. 26, at 4 n.8)

14

*Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any factual matter in dispute; the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

### DISCUSSION

Allstate's Motion for Summary Judgment

Allstate moves for summary judgment, arguing Plaintiff's misstatements in her insurance application and during the application process rendered the policy void *ab initio* and that she cannot establish a question of fact about her bad faith claim. (Doc. 27).

*Breach of Contract / Declaratory Judgment*

Plaintiff brings a breach of contract claim against Allstate for Allstate's failure to cover her loss. (Doc. 1-3, at 3-4). Allstate asserts a counterclaim for a declaratory judgment that the policy is void from its inception. (Doc. 9, at 7). In the present motion, Allstate asserts it is entitled to summary judgment because Plaintiff made misrepresentations in her insurance application regarding whether (1) Plaintiff resided at the property, (2) the property was under

15

construction, and (3) Plaintiff had any previous losses. It asserts that these misrepresentations rendered the policy void *ab initio*. Plaintiff contends issue of fact prevent summary judgment. For the reasons set forth below, the Court finds Allstate has not demonstrated its entitlement to summary judgment.

The parties agree about the law applicable to Allstate's motion. Under Ohio law, if an insured makes a material misstatement in an insurance application, such misstatement will render policy void *ab initio* if the statement constitutes a warranty, as opposed to a misrepresentation. *Allstate Ins. Co. v. Boggs*, 271 N.E.2d 855, 858 (Ohio 1971). To create a warranty, the misstatement must: (1) appear "on the face of the policy or in another instrument specifically incorporated in the policy," such as an application; and (2) the policy must "clearly and unambiguously" warn the insured that a misstatement renders the policy void *ab initio*. *Id*.

It is undisputed Plaintiff was not living at the property and the property was under repair at the time she obtained the Allstate policy. It is further undisputed Plaintiff had a previous fire loss in June 2022. Finally, it is undisputed the application submitted by Atkins to Allstate for Plaintiff (which does not bear Plaintiff's signature) states (1) Plaintiff lived in the property as her primary residence and the residence would be occupied within the next 30 days; (2) the property was not "in [c]ourse of [c]onstruction;" and (3) Plaintiff had no loss history in the past five years. (Doc. 9-2, at 4). But Plaintiff argues that questions of fact prevent summary judgment because there is evidence that she did not make any misrepresentations, the representations now cited were instead filled into her application by Atkins, and she never signed the application. In essence, Plaintiff argues Allstate cannot establish the first *Boggs* prong – that she herself made a misstatement to Allstate that was then incorporated into the policy. The Court agrees that factual disputes prevent summary judgment.

First, Allstate argues Plaintiff misrepresented her residency at the property. The Court finds a factual dispute over whether Plaintiff made such a misrepresentation. There is conflicting testimony regarding whether Atkins asked Plaintiff if she was currently physically residing at the property or whether he specifically asked if the residence would be occupied in the next 30 days before filling out the application. *See* Plaintiff EUO at 76-77;[9] Atkins Depo., at 71-74. For example, when asked whether he asked Plaintiff if she lived at the address, Atkins responded: "Correct. If it's her primary address." (Atkins Depo., at 72). And when asked specifically about the 30-day occupancy, he responded that answer was "based on her information" and that Plaintiff "gave me no indication that she was not living there. . . . Because she - - . . . the amount of time she had been there." *Id.* at 74. The Court finds a reasonable jury examining the evidence could find Atkins did not directly ask Plaintiff whether she was physically residing at the property (or if it would be occupied during in 30 days as stated on the application) and perhaps assumed she did based on responses to questions regarding "her primary address" or the length of time she had owned the home. And because Plaintiff did not sign the application adopting the representations made therein, the Court cannot attribute such representations to Plaintiff.

Second, Allstate argues Plaintiff made a material misrepresentation by representing the property was not under construction when it in fact was. Again, the application completed by Atkins says: 'NO" after "Dwelling in Course of Construction." (Doc. 9-2, at 4). Atkins testified he did not ask Plaintiff about construction "because the home was completed," "[t]here was no indication that it was under construction" and Plaintiff "never mentioned anything." (Atkins Depo., at 87). Bachmeier testified Atkins "was told that it was being renovated and she would be

---

9. To the extent Plaintiff's (or Atkins's) own testimony is internally contradictory on whether she was asked this question, "the decision as to what to believe and what to disregard in Plaintiff's [or Atkins's] deposition testimony is entrusted to the jury at trial, not to the Court on summary judgment." *Kimble v. State Farm Fire & Cas. Co.*, 2013 WL 4501023, at *4 (N.D. Ohio).

moving back in within 30 days." (Bachmeier Depo., at 79). Plaintiff testified Atkins asked her about repairs, and she told him she "had . . . to make repairs" and Atkins stated in response "you can make all the repairs you need to make to your home." (Plaintiff EUO, at 78). Bachmeier further testified that there was some difference between "renovation" and "construction," but she did not know if the policy had separate definitions. (Bachmeier Depo., at 81). Thus, Allstate has not established as a matter of law that representing the property was not under construction was a misrepresentation, nor that Plaintiff herself made such a misrepresentation.

Third, there is also a factual dispute regarding whether Plaintiff made any misstatements regarding her prior loss. Allstate argues Plaintiff misrepresented no prior losses in her application when, in fact, she had a fire loss in 2022. However, Plaintiff testified: (1) she did not recall if Atkins asked her if she had prior losses; and (2) she did not tell Atkins about the prior fire because "[h]e didn't ask." (Plaintiff EUO, at 76-77).[10] Atkins also testified he did not recall whether he specifically asked Plaintiff about prior losses. (Atkins Depo., at 75). He further testified that the five-year loss history section of the application is generated from the CLUE report, unless the agent "override[s] it based on information provided from the customer." *Id.* Further, Atkins testified the "Claim Free Discount" is "determined by the system" and automatically applied when the loss report is run and returns no losses. (Atkins Depo., at 46-47, 53-54). Again, there is a factual dispute regarding whether the statement of "zero" prior losses is Plaintiff's statement.

All of these alleged misrepresentations appear on the application form. Under Ohio law, an applicant's "signature and assent to the statement that the answers contained in the application

---

10. Again, to the extent that Plaintiff's testimony is internally contradictory, resolving such internal conflict is for the fact-finder. *See Kimble*, 2013 WL 4501023, at *4.

were correct and complete serve, as a matter of law, as his adoption and ratification of the statements contained therein notwithstanding his claimed failure to review the application." *Buemi v. Mut. of Omaha Ins. Co.*, 524 N.E.2d 183, 189 (Ohio Ct. App. 1987). But Plaintiff did not sign the application, and as set forth above, there are factual disputes regarding how the representations on the application came to be. *Cf., e.g.*, *Jaber v. Prudential Ins. Co.*, 681 N.E.2d 478, 480 (Ohio Ct. App. 1996) (affirming grant of summary judgment where plaintiff admitted he signed the application but argued "he [was] not responsible for any misstatements that appeared in the application because the agent actually filled out the form").

Allstate is correct that Plaintiff's intentions or good faith in making any challenged statement are not relevant. *See Certain Underwriters at Lloyd's of London v. KG Admin. Servs., Inc.*, 2021 WL 1943369 (6th Cir.) ("For a true warranty, the insured's good faith is of no consequence—a false warranty renders the policy void ab initio even if the falsity is innocent.") (citing *Republic Mut. Ins. Co. v. Wilson*, 35 N.E.2d 467, 468 (Ohio 1940) ("If the statements as to material facts are false they void the contract of insurance regardless of the knowledge of their falsity or the intention of the defendant.")). "Put differently, a warranty that is not literally true voids a policy ab initio." *Id.* (citing *Spriggs v. Martin*, 182 N.E.2d 20, 22 (Ohio Ct. App. 1961) ("[A] warranty is a stipulation in writing on the face of the policy, on the literal truth of which the validity of the entire contract depends.")). The core of Allstate's argument, however, relies upon establishing Plaintiff's "statements" in the application as the relevant warranties. But there are questions of fact regarding whether those statements can be attributed to Plaintiff given (1) the lack of signature on the application upon which Allstate relies for the alleged misrepresentations, and (2) the testimony of Plaintiff and Atkins as to how those statements

19

came to be represented on the application.[11] Allstate's motion for summary judgment on Plaintiff's breach of contract claim (and on its own declaratory judgment claim), is therefore denied. *See, e.g.*, *Kimble v. State Farm Fire & Cas. Co.*, 2013 WL 4501023, at *3-4 (N.D. Ohio) (finding factual question precluded summary judgment where Plaintiff testified an insurance agent filled in the alleged misrepresentations on her application and the agent never asked her the questions she allegedly misrepresented the answers to).

*Bad Faith*

Allstate also moves for summary judgment on Plaintiff's bad faith claim. It first contends that, due to the misrepresentations, the policy is void *ab initio* and Plaintiff necessarily cannot establish her claim. (Doc. 27, at 11). It alternatively argues Plaintiff cannot satisfy the bad faith standard. *Id.* at 12. Having found factual disputes prevent summary judgment on Allstate's first argument, the Court only addresses the second.

In Ohio, "an insurer has the duty to act in good faith in the handling and payment of the claims of its insured." *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1316 (1983). "[A]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994) (citation modified). Denial of a

---

11. Finally, in reply, Allstate argues that "[d]espite Plaintiff's claims there was no evidence she was provided the application, [she] had ample opportunity to review and correct her application. [Plaintiff's] failure to review and correct the application does not mean she did not make the statements contained in the application." (Doc. 36, at 4). It further cites Plaintiff's acknowledgement during her EUO that she received and read her Policy after it was issued. *Id.* at 5-6. It contends Atkins testimony demonstrates "customers, like Plaintiff are provided a copy of the application by e-mail when it is submitted" and "[t]he only logical inference is that Ms. Moore's application was provided to her through an email address she had access to for her review." (Doc. 26, at 3). But neither of these arguments speaks to whether Plaintiff herself made misstatements *prior* to the issuance of the policy that were then warranties upon which the validity of the policy relied under *Boggs*.

20

claim is not reasonably justified when it is done arbitrarily and capriciously. *See Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1320 (Ohio 1983); *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992). However, denial of a claim may be reasonably justified when "the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 605 N.E.2d 936, 943 (Ohio 1992); *see Maxey v. State Farm Fire & Cas. Co.*, 689 F. Supp. 2d 946, 953 (S.D. Ohio 2010). "The test, therefore, is not whether the defendant's conclusion to deny benefits was *correct*, but whether the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial." *Thomas*, 974 F.2d at 711. "Stripped to the bare essentials, the central factual issue in the bad faith claim is whether or not [the insurer] had a reasonable basis to deny [the insured's] claim." *Abon, Ltd. v. Transcon. Ins. Co.*, 2005 WL 1414486, at *6 (Ohio Ct. App.).

"On a motion for summary judgment, Ohio law directs courts to assess bad-faith-denial-of-coverage claims from the perspective of what information motivated the insurer's denial." *Smith v. Allstate Indem. Co.*, 304 F. App'x 430, 432 (6th Cir. 2008); *Cook v. Erie Ins. Co.*, 2020 WL 13453595, at *4 (S.D. Ohio) ("The key inquiry is whether the insurance company's reasoning for its decision to deny or delay benefits was reasonably justified."). "To grant a motion for summary judgment brought by an insurer on the issue of whether it lacked good faith in the satisfaction of an insured's claim, a court must find after viewing the evidence in a light most favorable to the insured, that the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Abon*, 2005 WL 1414486, at *5. By contrast, "[t]o withstand a motion for summary judgment in a bad faith claim, an insured must oppose such a motion with evidence which tends to show that

21

the insurer had no reasonable justification for refusing the claim, and the insurer either had actual knowledge of that fact or intentionally failed to determine whether there was any reasonable justification for refusing the claim." *Id.*

Allstate argues its investigation "was reasonable and justified" and it had "reasonable basis for concluding the Policy was void." (Doc. 36, a6 11-12). However, given the above analysis finding questions of fact remain on whether Plaintiff made misrepresentations to satisfy the first *Boggs* prong, the Court finds questions of fact also remain that prevent summary judgment on the bad faith claim. A jury considering the totality of the circumstances who believes Plaintiff's version of events could find that Defendant had no reasonable justification to void her policy and deny her claim.

Lakeview's Motion for Summary Judgment

Lakeview also moves for "summary judgment in its favor as to Plaintiff Shevonne Moore's Complaint." (Doc. 26). It contends that it "is listed as a mortgagee on the Policy and in accordance with the Policy . . . has a right to the insurance proceeds *if* Plaintiff is successful on her claims." *Id.* at 2 (emphasis added). Plaintiff filed no opposition to the motion. Allstate responds that Lakeview's motion seeks an impermissible advisory opinion and that the motion is not ripe. (Doc. 30).

The Court's above denial of Allstate's summary judgment motion does not resolve Plaintiff's claim for coverage but rather leaves it expressly unresolved. The Court's ruling on the coverage dispute means only that Allstate has not demonstrated as a matter of law that the contract is void *ab initio* and factual disputes remain. Indeed, in Lakeview's own reply brief, it argues: "*If* the Plaintiff is successful in her claims and the Policy is deemed to have existed at any point, the standard mortgage clause in the Policy *will apply* providing Lakeview with a right

to recovery." (Doc. 32, at 8) (emphasis added). Factual questions prevent a determination regarding the existence of the policy at this stage. The Court therefore finds it would be premature to decide Lakeview's motion. *See* Doc. 29. Lakeview' motion is therefore be denied without prejudice.[12]

**CONCLUSION**

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant Allstate Vehicle & Property Insurance Company's Motion for Summary Judgment (Doc. 27) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Lakeview Loan Servicing, LLC's Motion for Summary Judgment (Doc. 26), be and the same hereby is, DENIED without prejudice.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: March 5, 2026

---

12. In its motion Lakeview appears to seek (and Allstate construes Lakeview as seeking) a declaratory judgment that if Plaintiff recovers from Allstate, it is entitled – under the mortgage clause in the policy – to recover the unpaid mortgage loan principal balance. *See* Doc. 29, at 3; Doc. 30, at 2; Doc. 32, at 6. But at present, no such affirmative claim is asserted by Lakeview in this case. Rather, after intervening as a Defendant, Lakeview simply filed an Answer to Plaintiff's Complaint and asserted, as an affirmative defense, that "[i]f Moore prevails on her claims against Allstate and payment under the said policy is issued, Lakeview is entitled to have its mortgage paid in full pursuant to the Mortgagee Clause in the policy." (Doc. 16-1, at 4). Despite this, no party appears to substantively contest Lakeview's interest in the outcome of this case should Plaintiff ultimately recover from Allstate.

23
